1     IN THE UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF TEXAS

3                   DALLAS DIVISION

4
   UNITED STATES OF AMERICA,      )
5                                  )
                                   )
6             Plaintiff,           )
   vs.                            )Case No. 3:14-CR-270-L
7                                  )
   JORDAN PORTER,                  )
8                                  )
              Defendant.           )
9  _____

10        REPORTER'S TRANSCRIPT OF PROCEEDINGS

11       HAD ON WEDNESDAY, OCTOBER 28, 2015

12              SENTENCING HEARING

13   BEFORE THE HONORABLE SAM A. LINDSAY, JUDGE PRESIDING

14          A  P  P  E  A  R  A  N  C  E  S

15 MS. CAMILLE SPARKS
   U.S.  Attorney's Office
16 Department of Justice
   1100 Commerce Street
17 Third Floor
   Dallas, TX 75242-1699
18 camille.sparks@usdoj.gov
   (214)659-8600
19
   COUNSEL FOR THE GOVERNMENT
20

21 MR. JEFFERY C. KING
   Law Office of Jeffery C. King
22 3131 McKinney Avenue
   Suite 825
23 Dallas, TX 75204
   jeff@jeffkinglaw.com
24 (214)416-9100

25 COUNSEL FOR THE DEFENDANT JORDAN PORTER

```
 1               I    N    D    E    X

 2                                    VOLUME   PAGE

 3   COURT'S RULING                      I      58

 4   REPORTER'S CERTIFICATE              I      74

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

2  WITH ALL PARTIES AND COUNSEL PRESENT.)

3          THE COURT: This is United States versus Jordan

4  Michael Porter, Case Number 3:14-CR-270-L.  What says the

5  government?

6          MS. SPARKS:  Camille Sparks for the government.

7          THE COURT: Thank you, Ms. Sparks.

8          MR. KING: Jeffery King for Mr. Porter.

9          THE COURT: Thank you, Mr. Porter.

10      Sir, are you Jordan Michael Porter?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT: Do you know why you are here today?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT: Why is that?

15          THE DEFENDANT:  To be sentenced.

16          THE COURT: Are you ready to proceed?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT: With respect to this matter the Court

19  has before it the presentence report, the government's

20  statement regarding the presentence report in which it

21  states that it has no objections, the Defendant's

22  objections to the presentence report, the government's

23  response to the Defendant's objections to the presentence

24  report, the addendum to the presentence report, the

25  Defendant's memorandum for nonguidelines sentence, the

1    Defendant's addendum to the sentencing memorandum which

2    includes character letters from family friends.

3          Are there any other written documents that the Court

4    should have received, but has not received concerning

5    this matter?

6                MS. SPARKS:  Not from the government.

7                MR. KING: No, Your Honor.

8                THE COURT: All right, Mr. King, have you had

9    sufficient time to read and discuss the presentence

10   report and the addendum to the presentence report with

11   your client, Mr. Porter?

12               MR. KING: Yes, Your Honor.

13               THE COURT: Mr. Porter, have you had sufficient

14   time to read and discuss the presentence report and the

15   addendum the presentence report with your attorney,

16   Mr. King?

17               THE DEFENDANT: Yes, Your Honor.

18               THE COURT: All right, there is an objection to

19   the presentence report made by the defense, and defense

20   objects to paragraph 24.  Specifically, the defense

21   objects to the application of United States Sentencing

22   Guidelines Section 2G2.1.  It is the Defendant's

23   contention that paragraph 24 of the presentence report

24   incorrectly states that the Defendant requested JV1 to

25   simply send him lewd and lascivious photos.  He points to

1  the factual resume which the government stipulates which

2  there is no corroborated evidence that the Defendant

3  asked JV1 to make a child pornography photos that were

4  sent to him, and he therefore, argues that United States

5  Sentencing Guidelines 2G2.2 is the appropriate sentencing

6  guidelines.

7       Did I summarize your objections correctly, Mr. King.

8            MR. KING: Yes, Your Honor, I have a two -- a

9  couple points to elaborate, but the Court did correctly

10 summarize.

11           THE COURT:  All right, just one second.  All

12 right, you said you would like to elaborate.  Make your

13 point.  The Court will have some questions in this

14 regard.

15           MR. KING: The defense's objection is the

16 application of the cross reference portion of 2G2.(c)(1)

17 and that cross reference applies and quoting the section

18 for a minor engaged in sexually explicit conduct for the

19 purpose of production of a visual depiction of such

20 conduct.  In other words, the PSR is claiming that

21 Mr. Porter requested these pictures specifically for the

22 purpose of producing them.  Now, that section is in there

23 for a reason to punish people for doing that exact thing.

24 In this case there is no evidence even by a preponderance

25 of the evidence -- by the preponderance standard that

1 applies here at sentencing that Mr. Porter requested

2 those images for that purpose.  That he even requested

3 the images, there is argument to be made there, but the

4 fact that he may have requested these images specifically

5 for the purpose of production, there is simply no

6 corroborating evidence as agreed to buy the government

7 and defense in the factual resume.  I understand that we

8 used the words corroborating evidence in the factual

9 resume, but the truth is, Your Honor, there is no

10 evidence to support that Mr. Porter elicited these

11 photographs for the purpose of reproducing them.

12 Obviously, the reason for the objection is that it

13 significantly increases the base offense level.

14         THE COURT: Let me make certain that I understand

15 your objection.  Are you saying he did not request the

16 production of the pictures or he did not request them for

17 a particular purpose?  Which one are you saying?

18         MR. KING: For the purpose of the objection, I am

19 arguing that Mr. Porter did not request the images for a

20 specific purpose.  I would add to that point in the

21 factual resume both the government and the defense agreed

22 that there is no corroborating evidence that Mr. Porter

23 requested those pictures, so --

24         THE COURT:  I don't know if I necessarily agree

25 with that based upon what I have seen.  Now, if you said

1  he didn't request them, that is one thing.  If you said

2  he did not request them for a specific purpose, that is

3  another thing.  I don't know the time sequence.  I have

4  looked at the correspondence.  In fact, that is one thing

5  I wanted to look at the entire correspondence that took

6  place between Mr. Porter and the minor, and I looked at

7  that.

8       Part of the problem is that there are no indication

9  of time as to when the precise exchanges were made.  I

10 see the dates, but I don't see anything that shows the

11 exact time with respect to the MeowChat and later on

12 there were e-mails.

13      I think that I really do not have a problem insofar

14 as request is made because I don't think that that when

15 you take all reasonable inference into account that

16 argument can be made with a straight face.

17      The reason I say that -- this is Mr. Porter.

18      "So the pictures did nothing for you?"  And there is

19 an emoji or emoticon frowning face.  JB said, "yes, it

20 did," and there is a shot, and then she made a statement,

21 quote, It made me so horny, unquote.  Your client

22 answers, Yours would if I had any, and there are two

23 laughing emoticons.

24      The minor says, Hmm one second.  And then your

25 client says K, which means okay, and JV1 says check your

1  e-mail.  Then your client says, Dang, so sexy.  And JV1

2  says, You like, with a question mark.  Response back by

3  JV1, Can't wait in person to see you.  Even if it is not

4  one hundred percent understood and two kisses and

5  emoticons.

6      Given the sex-charged nature of the conversation and

7  what had been going on between these two individuals, and

8  then he can already sent two pictures of her, and then he

9  makes a statement, Yours would, if I had any.  Whether

10  you call that suggestion or out right request, I think it

11  is, frankly speaking, given how things are taking place,

12  I think it would be fatuous to say that was not a

13  request.  The question is whether he made a request for a

14  particular purpose.  As far as saying he did not request

15  the photos, I do not buy that.  Given the totality of the

16  circumstances and what was going on, I clearly think a

17  reasonable inference can be made that he did, in fact,

18  request those pictures.

19      You know, a lot of times you don't use the exact

20  words, but you get the context in which something takes

21  place.  Then you play on words, well, he didn't request

22  this.  He just suggested that.  I disagree with that.

23  Sort of like, I have heard lawyers make argument a police

24  officer or state trooper pulls the car over, and the

25  state trooper says ma'am, may I see your driver's

1   license, please.  I have had lawyers say that was not an

2   order that is a mere request.  That is nonsense.  If you

3   don't produce the license right away, you see what

4   happens.  All I am saying is given the totality of the

5   circumstances, I think he did request.

6        There was a request.  Here is what I do not know,

7   and could have been found out.  I do not know whether the

8   pictures were already in production or whether she took

9   them then.  She did say after that statement was made,

10  Hmm, one second.  I do not know if she took the picture

11  then and sent it to him or they were already there.

12      I think that could have been determined, though, but

13  I don't have that before me, so I don't know.  That is

14  part of the problem.  I don't know whether that picture

15  was already in existence or whether she made it right

16  then and there after he made the statement.  You were

17  going to say something, Mr. King.

18          MR. KING: I understand, Your Honor, where the

19  Court is leaning with respect to my argument that

20  Mr. Porter did not request the images, and I don't want

21  to belabor that point any further, other than to say I

22  think the purpose and the reason why we agree and

23  obviously the government is going to respond to this as

24  we agreed there was no evidence requested in those images

25  in the factual resume is because that -- inference aside,

1  there was no request that Mr. Porter or from Mr. Porter

2  that he produced images that would qualify as lewd and

3  lascivious.

4      I understand where the Court is leaning with the

5  inference there, I don't want to go any further down that

6  road because our objection and what matters here is they

7  were not produced for the purpose of production.  With

8  respect to the Court inquiring as to when the images --

9  whether or not they pre-existed or they were taken

10 pursuant to this conversation that happened over text

11 messages, I think my only response to that, and I don't

12 know the answer to that question, but I think the purpose

13 of this cross reference section is if the Defendant is

14 requesting those images be sent to him for the purpose of

15 production.

16     In other words, the type of pornographers request

17 those so they can produce them, use them for their

18 benefit, or to send them to someone else, put them on

19 line.  I think that is the purpose for the cross

20 reference section, and that is why we are adamant that

21 does not apply to Mr. Porter.

22         THE COURT: Well, the reason I made the statement

23 it seems to me at times hairs are being split, and I want

24 to make certain what we are focusing on, if you say

25 there is not sufficient evidence that was produced for

1   the purpose of production.

2          MS. SPARKS:  May I be heard at some point, Your

3   Honor?  I think I may be able to clarify things.

4          THE COURT:  I was about to make a comment, but

5   certainly I was going to ask you to speak anyway,

6   Ms. Sparks.  Certainly, you may speak.

7          MS. SPARKS:  I agree with the Court.  I think we

8   are splitting hairs a bit.  I don't agree with the legal

9   analysis of what the cross reference is implying.

10  However, was the information what the government was

11  trying to suggest in the factual resume as well as

12  response to the PSR, what we don't have is affirmative

13  evidence, and the Court mentioned this that she produced

14  those because of the request by the Defendant.  There was

15  a request by the Defendant, however he wants to couch it.

16  What we don't want and what we can't know is because she

17  deleted her pictures, so we didn't have any way to say

18  when she made those.  Because there was no corroborated

19  evidence to suggest when she made those, what we do have

20  is her statement that she made those pictures because he

21  asked for these.  But there was no corroboration of that,

22  so that is what we were getting out of the factual.  What

23  I was saying in my response to my objections to the PSR

24  because there is no corroboration of that, that we would

25  inure the benefit of that and not seeking the cross

1  reference.  I don't see that the cross reference is

2  saying that you have to reproduce these or put them

3  online or anything like that.  All that requires is there

4  is a request and somebody produces images of child

5  pornography of that request.  That is how I see it.

6            THE COURT: I would agree with the government on

7  that, and I was going to come to that later.  I agree

8  with you, Ms. Sparks.  I do agree with the government

9  about corroboration, and another question was answered by

10 Ms. Sparks, and I was going to ask if the picture was

11 still in existence, so we can see when they were actually

12 sent.  It is my understanding they have been deleted, so

13 the bottom line is, I will -- I will sustain the

14 objection and I will go with the different guideline.

15 Just one second.

16            (PAUSE IN PROCEEDINGS.)

17            THE COURT:  Now, if I sustain the objection,

18 Mr. King, the rule at the applicable guideline the

19 offense to which your client pleaded guilty is found at

20 United States Sentencing Guidelines Section 2G2.2.  Does

21 that take care of your other objections as to paragraph

22 25 through 27?

23            MR. KING: It does, Your Honor.

24            THE COURT: All right.  In light of the Court's

25 ruling, the Court concludes that its rulings as to which

1  section of the guidelines is applicable necessarily takes

2  into account and takes care of Defendant's objections to

3  paragraph 24 and Defendant's objection to paragraphs 25

4  through 27.  All right, I believe there is another

5  objection.

6       There is an objection to paragraph 37.  I

7  understand the defense is objecting to the misdemeanor

8  conviction should not be considered in calculation of his

9  criminal history which would make his criminal history a

10  zero.  I guess the question then becomes, is it really

11  even relevant because it does not change Mr. Porter's

12  criminal history category.  It still remains in one.  It

13  does not affect the calculation of the advisory

14  guidelines so.  What the Court can ascertain, the

15  objection is really moot; is it not, Mr. King?

16       MR. KING: Thank you, Your Honor, and I would

17  agree that it does not have an impact on the criminal

18  history, and therefore, does not have an impact on the

19  offense level in this case.  Just the same it is

20  important that these things are caught and are accurate

21  and law specifically or rather the section specifically

22  states that it should be added one point if the probation

23  included a period of time more than twelve months.  We

24  are splitting hairs, but the correct calculation for that

25  should be a zero not a one.  Even though it does not

1   impact the criminal history for Mr. Porter, it is

2   important to get this accurate.  This is something that

3   will be part of his record and a part of this record and

4   that is why the defense put forth that objection.

5   Referring to Section 4A1.1(c)(1) requires a period of

6   probation more than twelve months for one point to be

7   added.

8          THE COURT: Well, let me take a look at

9   something.  Before I go any further, Ms. Sparks, does the

10  government have a position on this objection?

11         MS. SPARKS:  My initial response and my response

12  to the objection to the PSR is that it had no impact.

13  This is going to go in his record whether he gets a

14  criminal history point.  Beyond that, I would agree with

15  the probation officer's response that he displayed a

16  weapon in this terroristic threat and threatened a

17  victim, and it is not one of the listed convictions noted

18  in 4A1.2(b).

19         MR. KING: We are not objecting to the fact that

20  it is included in the PSR, that just a point was

21  included.

22         THE COURT: Ms. Shifflett, can I see you at the

23  bench a minute.

24         (PAUSE IN PROCEEDINGS.)

25         THE COURT: With respect to that objection, that

1  is the objection to paragraph 37 of the presentence

2  report.  The Court determines that that determination by

3  the probation officer was correct, and that was the

4  Court's initial impression, and the Court brought

5  Ms. Shifflett up to confirm a couple of things and what

6  she set out with the Court was consistent with what the

7  Court's thinking was regarding the objection, therefore,

8  the objection is overruled.

9       Any objections as to the advisory guidelines?

10          MR. KING: No, Your Honor, all right, if there

11  are no other objections, the Court will proceed to

12  determine the advisory guidelines.  Based upon the

13  Court's rulings, it previously stated on the record, the

14  base offense level is 22.  With respect to this case in

15  light of the rulings, the guidelines for a violation of

16  Title 18 United States Code Section 2252A(a)(1) is

17  confined in United States Guidelines Section 2G2.2 and

18  that particular section provides that an offense shipping

19  or receiving child pornography has a base offense level

20  of 22.

21       We next go to specific offense characteristics and

22  the evidence is clear that the Defendant Mr. Porter

23  engaged in a pattern of activity involving the sexual

24  abuse or exploitation of a minor, therefore five levels

25  are added pursuant to United States Sentencing Guidelines

1   2G2.2(b)(5).

2     Also, with respect to specific offense

3  characteristics, the offense involved the use of a

4  computer or an interactive computer service for

5  possession, transmission, receipt, or distribution of

6  materials, two levels are added pursuant to United States

7  Sentencing Guidelines Section 2G2.2(b)(6).  That makes

8  the adjusted offense level 29.

9     The next issue is acceptance of responsibility.  The

10  Court determines that Mr. Porter has accepted

11  responsibility.  The only question is whether he gets a

12  two-level reduction for acceptance of responsibility or a

13  three-level reduction for acceptance of responsibility.

14     Ms. Sparks, at this time does the government move

15  pursuant to United States Sentencing Guidelines Section

16  3E1.1(b) for the additional level for acceptance of

17  responsibility?

18        MS. SPARKS:  The government so moves.

19        THE COURT: Thank you, Ms. Sparks.

20  The government has moved for the additional level for

21  acceptance of responsibility.  The offense level is 16 or

22  greater.  The government's motion is well taken.  It is

23  granted and Mr. Porter will be allowed a three-level

24  reduction for acceptance of responsibility.  That makes

25  the total offense level 26.

1       Mr. Porter has a criminal history category of I.

2   With a criminal history category of I and a guideline --

3   with a criminal history category of I and total offense

4   level of 26, that gives a guideline range of imprisonment

5   of 63 to 78 months.

6       Are there any comments or objections to the Court's

7   calculation of the advisory guidelines?

8            MR. KING: No, Your Honor.

9            THE COURT: As the Court stated earlier, the

10  guidelines are advisory.  In addition to considering the

11  advisory guidelines, a sentencing court must also

12  consider certain statutory factors.  The statutory

13  factors are set forth in Title 18 United States Code

14  Section 3553(a)(1) through (7).  When the Court imposes a

15  sentence, it must impose a sentence that is sufficient

16  but not greater than necessary to accomplish the

17  objectives or purposes set forth in paragraph (a)(2) of

18  Section 3553.  In particular, a sentencing court is

19  required to impose a sentence that reflects the

20  seriousness of the offense, one that promotes respect for

21  the law, one that provides just punishment, one that

22  serves or acts as an adequate deterrent to criminal

23  conduct on the part of the defendant, one that protects

24  the public from further crimes of the defendant, and also

25  a sentence that provides the defendant with the needed or

1  necessary educational or vocational training, medical

2  care, or other correctional treatment in the most

3  effective manner.

4      The Court will take all of these factors into

5  consideration before it imposes sentence against

6  Mr. Porter.

7      Mr. King, would you like to be heard on behalf of

8  your client?

9          MR. KING: Yes, Your Honor, thank you.  Your

10 Honor, as we stated in the sentencing memorandum filed

11 with this court, it is the defense's position that Jordan

12 Porter rates a downward variance down to the statutory

13 minimum.  In support of that, I would like to bring up

14 several categories first is the family.  As the Court is

15 aware in cases like this of this nature, a lot of times

16 the Defendant is subject to a life of loneliness which

17 leads to offenses like this many times.  Mr. Porter is

18 fortunate not to have that.  He has a family that

19 supports him, that cares for him, and that is waiting for

20 him with open arms once his time in detention is

21 complete.  They are actually here today, and I would ask

22 that they stand as I call their name, Jordan Porter's dad

23 Frank Porter, his mom Gloria Porter, his brother Matt

24 Porter, and his wife Kelly, and then also we have Jolene

25 Cornelius who wanted to be here today.  She is a friend

1   of the family.  Another friend is Mark Dickinson.  These

2   are people who have been at Mr. Porter's side this entire

3   time.

4       If the Court recalls at the last sentencing hearing

5   we heard from another lady Joan Boisen who traveled from

6   Iowa just to be here.  This is significant because Jordan

7   Porter has this network waiting for him upon his release

8   that will going to help him reintegrate back into

9   society.

10      As the Court noted Jordan Porter accepted

11  responsibility for this.  In fact, he did so very, very

12  quickly.  This is obviously -- not that any offense is

13  easy to plead guilty to, but this type of offense as the

14  Court is aware is very difficult to admit guilt to, to

15  walk into open court and say you did these things.

16  Mr. Porter stands here a remorseful person.  He is

17  shamed, embarrassed, but because of responsibility he has

18  elected to move on with his life.  In so doing, he has

19  made it so that the young girl involved in the case does

20  not have to walk into the courtroom and testify about

21  these things.  Her family is not required to be here to

22  testify.  He has insulated her in accepting

23  responsibility.

24      Your Honor, I think the Court has read through the

25  evidence associated with this case with respect to the

1  text messages and the chats and things of that nature.  I

2  think the one thing that would kind of separate

3  Mr. Porter from others that are labeled as an online

4  predator is that Mr. Porter did not get online seeking

5  out a young person.  There is no evidence of that.  In

6  fact, the Court has received a letter to the fact that

7  there was this age difference right at the beginning.

8  None of this is a defense.  None of this is excused, and

9  Mr. Porter realizes that.

10         THE COURT: What age did he list himself as

11  initially?

12         MR. KING: I believe it was 26, Your Honor.

13         THE COURT:  There is nothing indicated that he

14  listed his age as 18 or 19 or something like that?

15         MR. KING: No, Your Honor.

16         THE COURT: If I look through these records, I am

17  not going to find that that is the case?

18         MR. KING: I mean, if the Court has that

19  evidence, the defense is not aware of it.

20         THE COURT: Well, he would know.  He would know

21  more than anybody.  I am coming after the fact.  He would

22  know whether he did that or not.

23         MR. KING:  No, Your Honor.

24         MS. SPARKS:  Would you like me to speak on that,

25  Your Honor?

1      THE COURT: Well, let's go ahead and take it

2  while it is live.  Let's hear from you.

3      MS. SPARKS:  From his own written statement, I

4  believe he indicated that he was 18 years old initially.

5      THE COURT: I thought I had read that somewhere.

6  Ms. Shifflett, is that correct?

7      THE PROBATION OFFICER: That is correct.  I have

8  profile page where he listed his age at 18 on MeowChat.

9      THE COURT: I thought I read that.

10      MR. KING: Yes, Your Honor. If that is the case,

11  Your Honor, that is my mistake.  Just the same, I think

12  the point here is that --

13      THE COURT: He didn't make any effort to correct

14  you while he was standing there.  You said it was your

15  mistake.  He didn't make any effort to say no, Mr. King,

16  I did say that at one time.  I never saw him try to

17  correct you and say yes, I did.

18      MR. KING: That is my fault for not preparing him

19  today, Your Honor.  It has been a long time since we did

20  review this.  This is really prior -- we reviewed it

21  prior to the sentence hearing.  Really it has been months

22  since the plea.  That is my fault in springing that on

23  him.  It is not Mr. Porter's fault.

24      THE COURT: When you say springing on, my

25  statement was -- when I review a file or review the

1  evidence before me, I review everything because I know

2  the government is going to be making an argument.  I know

3  the defendants is going to be making argument, so I have

4  to acquaint myself with the facts.  In preparation for a

5  hearing, I acquaint myself with the facts, read the

6  statements or the filings filed by the various parties,

7  so I can anticipate the argument they will be making at

8  the hearing.  Along with that to put the argument in

9  context, you have to understand the factual background.

10 That is why I was bringing that up.

11      As stated earlier, it wasn't a situation where I want

12 to spring that on him.  As stated earlier, he would know

13 whether or not he listed his age as 18.  As stated

14 before, I am coming after the fact.

15          MR. KING: And I appreciate that, Your Honor.

16 Again, I would just reiterate in preparing this for

17 today, I was the one that essentially impressed out upon

18 him and that was my mistake.  I would ask the Court not

19 to hold that against Mr. Porter.

20          THE COURT: All right.

21          MR. KING: Again, I think the point here, Your

22 Honor, I bring these points up not in a defense to his

23 actions, but merely to separate him and set him apart

24 from those that get online with the specific intent of

25 reaching out to young girls.  I think an important piece

1  here along with the text messages and chats, the

2  government did seize computers and other devices and

3  there was no evidence at least revealed to us that

4  anything existed on those devices that would suggest that

5  Mr. Porter viewed child pornography or had these kind of

6  chats or conversations before.  That supports the

7  argument that this is not a pattern necessarily for him.

8       This is not something that he does.  This is not how

9  he spends his time.  This wasn't a moment of weakness.

10 It is certainly an error in judgment, but it is not

11 something that defines who he is.  The other

12 psychological assessment conducted and who went to

13 Seagoville and interviewed Mr. Porter and had him take

14 various tests.  He indicated a low to moderate risk for

15 recidivism based on several factors.  Importantly,

16 Dr. Brandon noted in his report, and this is somebody who

17 does this for a living and does these kind of forensic

18 interviews for a living, that in reviewing the evidence

19 for this case, between Mr. Porter and JV1 that the nature

20 of the conversations were -- did not begin necessarily

21 immediately asking about pictures or of a sexual nature.

22 Really it started a lot of the conversations in the form

23 of trying to form a relationship, and I know how that

24 sounds, but I think insofar as --

25          THE COURT:  Looks like it happened awfully quick

1  after they started talking.

2        MR. KING: My point is that wasn't all that

3  existed in the conversations.  There were other things.

4  They talked about things of a personal nature about

5  family, about their background.  So it wasn't -- with the

6  sole purpose of he went online for more pictures and

7  let's talk about sex and things like that.  You do see in

8  these types of cases where people get online, and that is

9  there objective.  That is their purpose.

10        Mr. Porter comes from a very supportive family.

11  His parents adopted him as an infant.  He does have some

12  medical conditions that are concerned that Dr. Brandon

13  noted this for his age somebody who is mentally very,

14  very immature.  It explains why he graduated second to

15  last in his class in high school.  It explains why he is

16  unable to necessarily relate very well with people his

17  own age, that he doesn't have that kind of confidence

18  that you would find in a person of his age, that a lot of

19  that has to do, perhaps, with his epileptic condition and

20  the embarassment integrated into society that goes with

21  that.

22        He knows there is a possibility in there that may

23  contribute to Mr. Porter's immaturity as far as his age

24  goes.  Your Honor, just to sum up, Mr. Porter understands

25  what he did here today.  He has been cooperative.  He has

1  a family that supports him, that loves him.  He came in

2  here very quickly in front of the magistrate and pled

3  guilty to this offense and accepted responsibility.  He

4  knows what comes with this.  He knows that he is going to

5  be leaving here wearing these same orange jumpsuit that

6  he is wearing right now.  He understands that he is going

7  to have to register as a sex offender and he welcomes

8  that as a method or a way to move on and to get beyond

9  this and get help and get better so he can reintegrate

10  with society.

11        For those reasons and factors under 3553(a) the

12  defense believes that a statutory minimum in this case is

13  sufficient but not greater than necessary to achieve the

14  objectives set forth in the Sentencing Guidelines.

15            THE COURT: The statutory minimum sentence is

16  what?

17            MR. KING: It is five years, Your Honor.

18            THE COURT: Okay, did -- I thought I saw

19  something earlier.  All right, just one minute.

20            (PAUSE IN PROCEEDINGS.)

21            THE COURT:  Okay, I understood the statutory

22  minimum to be five years or 60 months.  What puzzled me

23  is why did you ask for 14 months.

24            MR. KING: I actually filed a memorandum without

25  regard to the statutory minimum.  The argument still

1  stands.  Honestly, I've done a case like this before and
2  I used some of those same arguments, but I did file that
3  without regard initially, thus the addendum, so the Court
4  understood that I was well aware of the statutory
5  minimum.  The 14 months reflects a little bit more now
6  than the amount of time that Mr. Porter has served.
7         THE COURT: Tell me this, Mr. King.  Tell me how
8  a sentence of the statutory minimum would accomplish
9  those objectives set out in paragraph (a)(2) of Section
10  3553 Title 18.
11         MR. KING: Five years is still five years, Your
12  Honor.
13         THE COURT: That's true.
14         MR. KING: That is a significant amount of time
15  for a person to be away from society to be away from
16  family, not be able to get a job and live a normal life.
17  With regard to punishment, that is certainly an
18  appropriate punishment for an offense of this nature for
19  the facts of this nature with regard to how society views
20  this type of offense, I think it is fair to say, it is
21  well documented that these types of offenses will not be
22  tolerated.
23     As far as sending that message to society, I think
24  that is done.  As far as sending that message to
25  Mr. Porter, that message has been made clear as well.  He

1    is going to be going back to prison as well.  He pled

2    guilty to this offense.  He is going to be a registered

3    sex offender.  Those are the factors.  Even with regard

4    to the statutory, we are asking for three months lower

5    than the guidelines range.  Those factors certainly apply

6    and he should be sentenced to the statutory minimum of 60

7    months in this case.

8            THE COURT:  You know, I do not always agree with

9    the guidelines as a matter of policy.  Frankly speaking,

10   at times the guidelines don't always make sense in

11   certain context. One argument I hear defense attorneys

12   making from time to time is that you can have a situation

13   whereby there is no sexual contact at all with a minor or

14   a prepubescent minor and a person can end up with a much

15   higher guidelines sentence.  In other words, I won't say

16   all, I don't want to minimize, but what the person has is

17   certain images in his possession.  They may have 6000,

18   7000, or whatever in their possession, but yet there is

19   never any contact with the minor, and then sometimes the

20   guideline range goes up to can be as high as 360 months,

21   maybe even life depending on the criminal history of the

22   person.  A lot of that is driven by the add-ons in a case

23   merely by receiving pornography.

24       The argument I hear by defense attorneys and, frankly

25   speaking, it makes sense.  They will say, Your Honor,

1  there was no sexual contact; there was no rape; there was

2  no fondling; there was no penetration of the vagina and

3  so forth, and the guidelines are calling for a sentence

4  the same as a rapist would get or where there was sexual

5  contact.

6       I guess here I almost see the reverse going on.

7  There are a few images, but you have contact.  You may

8  say, Judge, well, five points were added for quote,

9  unquote, sexual contact.  There in lies the problem I

10 have with the guidelines.  Does the guidelines define

11 sexual contact?  Is there a definition?

12          MR. KING: Well, I know there is, Your Honor,

13 because we obviously looked into objecting to that five

14 points, and there is a reason why we didn't.  I am

15 familiar with the case law and policy arguments that the

16 Court was eliciting regarding the all of the sentences

17 that come along with possession of pornography images.

18 There is a reason we did not make that argument because

19 obviously in this case there is contact. As admittedly

20 from the get-go from Mr. Porter, he admitted that to law

21 enforcement and he did not object to that relevant

22 conduct in the PSR.

23      As the Court already stated, five points is a

24 significant increase if that comes along with the receipt

25 of child pornography.

1          THE COURT:  I guess that is my point.   You talk

2     about sexual contact.  As I was saying, that is why I

3     have an issue with the guidelines insofar as the

4     guidelines are concerned.  The latest version of the

5     guidelines describes prohibited sexual contact as meaning

6     any sexual activity for which a person can be charged

7     with a criminal offense and also includes production of

8     child pornography and does not include trafficking or

9     possession of child pornography.

10         The guideline definition as far as I am concerned is

11    way too broad and that is a problem I have.  Sexual

12    contact, that can mean -- that can be really describe

13    anything from touching or fondling all the way to sexual

14    intercourse.  In my humble estimation, those are not the

15    same thing.  It is one thing to touch or fondle someone

16    in the vaginal area or the breasts.  It is another thing

17    to kiss someone in the same areas.  It is another thing

18    to have sexual intercourse with a minor.  In other words,

19    sexual intercourse is much more serious than fondling.

20    The guidelines do not take that into account.  Let me

21    give you an example and maybe this will drive my point

22    home.

23         You know, there is a federal statute, and I can't

24    cite it right offhand, I believe is it Title 18 Section

25    924 deals with felon in possession of a firearm, and if

1   that person uses that firearm in relation to a drug

2   trafficking offense or a crime of violence, then the law

3   provides that there is a mandatory sentence that is

4   attacked onto the underlying offense.  Here is what is

5   interesting about that statute.  If the person possesses

6   in relation to a drug trafficking offense or crime of

7   violence, then the law says that you have to at least

8   tack on five years.  That is for possession.  If the

9   person brandishes the firearm, the minimum sentence to be

10  attacked on is seven years.  If the firearm is

11  discharged, it is ten years.

12      Do you see the point I am making?  I guess what I'm

13  saying is sexual contact as set out in the guidelines

14  does not tell the whole story.  Under that definition for

15  the mere -- I don't mean -- I hate to use the word mere

16  because it seems like I am minimizing the person who is

17  an adult having sexual contact with a minor, but I am

18  not.  But I am using that term to show the contrast.  For

19  touching or fondling a minor, those five points apply.

20  At the same time, those five points apply for actual

21  sexual intercourse, something is wrong that picture under

22  the guidelines.  So what I am saying, I don't think the

23  guidelines necessarily take into account what the Court

24  needs to consider with respect to the statutory factors,

25  and I would like to hear your comment on that because

1   that is weighing heavily on the Court.

2           MR. KING: I understand your point, Your Honor.

3   I think my response to that would be that same scale for

4   lack of a better term, I am sure there is a better one,

5   could apply to the nature of the sexual meeting, the

6   actual sex in that some cases you see where someone in

7   Mr. Porter's position uses a lot of persuasion and a lot

8   of deception to try to lure someone back to their house

9   or into their car, as you say to catch a predator to

10  present false image of yourself so you can gain entry

11  into their home.  It doesn't take those factors into

12  account either because when we talk about someone under

13  the age of consent, that's that.  So I think just as it

14  fails to make the consideration, the Court pointed out it

15  also fails to take into account which is why we brought

16  up the sentencing memorandum the nature and means by

17  which Mr. Porter committed this offense.

18         Again, I don't couch this in terms of being any kind

19  of offense or excuse, but he was -- it was -- he was open

20  about it.  He didn't use any kind of force.  He didn't

21  try to lure her.  He didn't try to convince her in any

22  way.  Not that that is an excuse, but I think under the

23  same guise of they distinguish between sexual contact and

24  sexual intercourse, I think that same argument could be

25  applied to the manner in which that sex presented itself

1   or happened.

2        THE COURT: Okay, let's talk about that since you

3   brought that up.  If my poor memory serves me correctly,

4   I think when they first started talking, this young lady

5   said she was kind of down in the dumps because her

6   boyfriend dumped her; isn't that correct?

7        MR. KING: Yes, sir.

8        THE COURT: Well, when somebody is like that,

9   only 15 years old, an older man is expressing interest in

10  her, she is vulnerable.  When you say he didn't use

11  certain means, you had a person who was vulnerable, who

12  was upset, maybe mildly depressed, anyway down in the

13  dumps because her boyfriend had quote, unquote, dumped

14  her.  If I understand the conversation correctly, he

15  essentially dumped her because the new girlfriend had

16  more physical attributes.  That is saying it

17  euphemistically.  So what I am saying, she is at a

18  vulnerable stage.  To be honest, when somebody is

19  vulnerable it doesn't take a lot in many situations.

20  I will also say this.  The young lady being recently

21  dumped, here is an older guy showing interest in her.

22  You are going to tell me that has no effect?

23        MR. KING: No, Your Honor, when you look at the

24  text messages and correspondence between these two, there

25  is no excuse.  There is no correct answer to that.  There

1   is no defense to that.  Mr. Porter understands that as

2   well.

3       I think by the Court's standards and society's

4   standards, there is no excuse for the dialogue that

5   happened.  The point I was trying to make to use the

6   Court's examples to compare this to other cases where we

7   see this kind of thing.  The Court has heard various

8   arguments from lawyers in my position saying to a

9   Defendant trying to better their sentence.  When you

10  compare them to cases like this as I am sure the Court

11  has seen -- I know I have seen cases where the Defendant

12  outright lures someone in or tries to convince them, hey,

13  it is okay, let's do this, trust me, no one will find

14  out.  This will make you feel better.  I am using

15  examples.  There are ways by which someone can actually

16  convince one or lure them, maybe change one who didn't

17  want to do this now they do want to do this.  That is the

18  distinction that sets this case a part from other cases.

19  The other point being, there is no evidence that this has

20  ever happened before.

21      The government had all of the devices all the

22  computers and the cell phones.  This was -- this was a

23  one time event, and I think that also sets us a part that

24  this is not who Jordan Porter is.  You can't defend the

25  statements there or the dialogue.  I would agree with the

1  Court there.  There is no excuse anyone could give that

2  would satisfy the Court or society.

3          THE COURT: Okay, there is evidence to indicate

4  that, but for the intervention of the young lady's

5  stepfather, this would have gone on indefinitely.

6          MR. KING: There is evidence of that, yes, Your

7  Honor.

8          THE COURT: There is no question.  He saw a

9  picture of her kissing an individual that appeared to be

10 older, and that is what kicked off the investigation.

11 Also, the pre-sentence report indicates and so does all

12 of this background information that I have here that the

13 reason it stopped was because a detective from the

14 Garland Police Department assumed the identity of the

15 juvenile or the minor, and Mr. Porter thought he was

16 communicating with the minor when, in fact, he was

17 communicating with a detective.

18     In fact, when he went out there and he was arrested,

19 he thought he was going to meet the minor.  As I stated

20 before, what stopped it was intervention.  So I don't

21 know how long it would have gone on.  We cannot say that.

22 We definitely know it would have continued to some point

23 because they had made, the two of them had made

24 statements or discussed meeting in the future beyond the

25 date that he was caught.

1    MR. KING: I would agree, Your Honor, there is no

2 indication as exactly how long this would have gone on.

3 Obviously, the evidence did go on for a period of less

4 than a month, but I understand the Court's point, and we

5 are not arguing that intervention didn't have something

6 to do.  Obviously, it did.

7    Again, our argument is not that he noticed what he

8 did was wrong right away and stopped.  It is not that

9 what he was saying to her was okay or in a gray area that

10 may be acceptable.  I am not going to insult the Court's

11 intelligence by making those arguments, but simply that

12 Mr. Porter did not use deception or try to lure someone

13 in that otherwise would not have consented to something

14 like this.

15    It is difficult to make that argument because when

16 you are under the age of consent, then that is that.

17 There is no -- you lose the right to make certain

18 arguments and I understand that.  I am just comparing

19 Mr. Porter's case to other cases of this nature where you

20 do have someone who is literally a predator.

21    THE COURT: I guess a lot of what takes away is

22 someone who is a minor we protect the minors at the

23 federal level and state level because minors are

24 incapable of making rational decisions.  They have not

25 reached -- they need the oversight of parents, guardians,

1   and society as a whole to protect them, and one reason we

2   protect minors is they are quite impressionable, so you

3   don't have to use a lot of sweet talk or fancy talk or

4   certain words when you are dealing with a minor because,

5   frankly speaking, they have not fully developed mentally.

6   That is why we protect them because they are incapable of

7   making rational decisions in all situations.

8          Anything else, Mr. King?

9          MR. KING: No, Your Honor.  There are some family

10  members that would like to address the Court if now is

11  the appropriate time we can do that now.

12          THE COURT: Certainly, we can do that now, and I

13  will hear from Mr. Porter later.

14          MR. KING: The defense calls Frank Porter.

15          THE COURT:  Sir, what would you like to tell the

16  Court?  State your name.

17          MR. FRANK PORTER:  Frank Porter.

18          THE COURT: All right, Mr. Porter, what would you

19  like to tell the Court?

20          MR. FRANK PORTER:  Well, I could go on about the

21  good things that Jordan has done in his life.  He has a

22  big heart.  He has even helped out some of inmates where

23  he has been at because they have come up short with funds

24  and things like that.  We need to remember in my opinion

25  when we are sentencing Jordan that you are sentencing the

1  whole family and friends and Jordan has expressed to me

2  that he has -- he knows that he was in the wrong and that

3  he has shown remorse.  He is truly sorry.  It is not

4  something that he is going to forget right away.

5      In my mind an extended sentence would only harden --

6  harden him.  He truly does not belong in the criminal

7  justice system.  That is just my opinion.  He is not a

8  perfect person, but who is?  Thank you.

9           THE COURT:  Thank you, Mr. Porter.

10          MR. KING: The defense calls Mr. Porter's

11 brother, Matt Porter.

12          THE COURT: All right, Mr. Matt Porter, what

13 would you like to tell the Court?

14          MR. MATT PORTER:  I wanted to start out saying

15 that you know Jordan doesn't come from a broken home.  In

16 today's society, it is very common for somebody to have

17 two or three different mothers or fathers in their life.

18 I think it is important to note that.  You know, his

19 older brother, my older brother is a retired marine.  My

20 older brother and I have never been arrested.  We have

21 never been in the system.  He comes from a good family,

22 good home.  I think all of those things should be duly

23 noted.

24      We are closing in on two years since I have been

25 going to church religiously weekly.  I don't usually use

1   the word born again, but, you know, the church that I go

2   to is life-giving, spirit-filled, Jesus focused, never

3   talk about negativity or sin, talk more about being more

4   like Jesus.  Jordan attended six or eight times between

5   the time I started going and this incident happened.  In

6   talking with Jordan, he has been in now 16 months, and I

7   think in the last 16 months, we have talked a handful of

8   times that he would like to get out.  He wants to be

9   attending church.  He wants to work at the church.  He

10  wants to help people in the situation that he is in.  He

11  wants to go back to school and be educated.  He wants to

12  get out and be part of society and be a productive part

13  of society.

14      I think the impact that this church has had on me in

15  the years and little bit that he went is speaking volumes

16  to who he is and where he wants to go.  I think difficult

17  thing for me is to stand here and maybe if you were in my

18  shoes, gosh, I can't believe this is happening.  How can

19  something in the grand scheme of things in someone's eyes

20  go fairly minor, but this is going to pass on someone's

21  soul, so significant, so I just hope you take into

22  account, you know, I have never been arrested and my

23  retired brother marine corps, no broken home, solid

24  family and friends, and I think where Jordan wants to go

25  in life.  Needless to say, I am very nervous, but that is

1  all I have to say.

2          THE COURT:  All right, thank you, sir.

3          MR. KING: Your Honor, finally, the defense would

4  call Jolene Cornelius.

5          MS. JOLENE CORNELIUS:  Good morning.

6          THE COURT: Good morning, Ms. Cornelius.

7          MS. JOLENE CORNELIUS:  I have lived across the

8  street from the Porters since they moved in in 2001.

9  Jordan was 16 at the time, I believe.  He was a tall

10  young man that was always helpful and cordial.  There

11  were many times I would call and ask him to do chores

12  around the house.  Many times he came over and visited

13  with me and my husband and would stay and have dinner

14  with us.  Of course, sometimes he didn't like the food we

15  were having, but he would stay.  We always considered him

16  like a second son to us.  I think Jordan is a good

17  person.  I think he can come out of this and be a good

18  person and be helpful to society, and I hope you will

19  take that into consideration because he has never been a

20  mean-spirited boy.  He has always been a young man that I

21  could always rely on and ask him for help any time I

22  needed it, and I thank you for listening to me.

23          THE COURT:  Thank you, Ms. Cornelius.  All

24  right, Mr. Porter, you have the right to address me

25  personally at this time and present any information that

1   you would like in mitigation of your sentence.  In other

2   words, if there is something would you like to tell me

3   about this matter before I impose sentence, now is the

4   time for you to do so.

5        THE DEFENDANT:  Right now, I would like to

6   apologize to my family on all the things that have

7   happened here.  I would also like to apologize to the

8   victim's family and all the hardships I have caused over

9   the past year here.  I have been going to church in

10  Seagoville, and I have been involved in Bible study, so I

11  am learning more and trying to better myself to learn

12  more about the Bible and learn more about how to move

13  forward with my life and how to better my life.

14        MR. KING: Jordan, are you little nervous to

15  talk?

16        THE DEFENDANT:  A little bit.

17        MR. KING: I want to ask you a few more

18  questions.  You heard me make a lot of arguments today

19  about the facts of your case.  To be clear, do you make

20  any excuses for your judgment in initiating conversation

21  with this young lady, make any excuses at all?  You admit

22  it?

23        THE DEFENDANT:  I admit what I have done is

24  wrong, and I do take responsibility for all my actions

25  that I have done.

1       MR. KING: Now, you mentioned that you were

2  getting involved in some religious activities at

3  Seagoville.

4       THE DEFENDANT:  Yes.

5       MR. KING: Tell us a little bit about that.

6       THE DEFENDANT:  We had a Bible study that all

7  the inmates have now formed.  We meet every night at 6:00

8  and everybody kind of gets to get up and speak about

9  anything that is going on in their life if they have any

10 problems and stuff like that.  We have two pastors that

11 come in on Sunday and Monday that speak for about an hour

12 for us.  I take notes and also I have asked many

13 questions to both of them about things that I can do to

14 help Seagoville grow and what good I can do there.

15      MR. KING: When you are actually released from

16 jail, what is it that you would like to do with your

17 life?

18      THE DEFENDANT:  One, I would like to go back to

19 school for probably business, but I would also like to go

20 back to school to help the church in any way if I can as

21 possible, to help people that have been in my situation

22 before, help them understand, you know what it is -- what

23 we have done is wrong and how to move forward with our

24 lives.

25      THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT: All right, anything else from the

2    defense, Mr. King?

3          MR. KING: No, Your Honor, just I think Jordan's

4    family said it best.  Matt said he does not come from a

5    broken home.  He comes from a loving and caring family.

6    He doesn't have that as an excuse for doing what he did.

7    What it does is it demonstrates he has people here to

8    help him reintegrate into society when that time comes

9    and to lift him up and support him.  That in and of

10   itself demonstrates he is not going to do this kind of

11   thing again.  Mr. Porter has a new found faith that he is

12   taking advantage of and that is something that he is

13   going to carry with him throughout his time in

14   confinement and when he is released.  He has been

15   cooperative the entire time.  It has been a pleasure to

16   get to know him, and for those reasons included in the

17   memorandum, the defense's position that a downward

18   variance is appropriate to a time of 60 months.  Thank

19   you.

20         THE COURT: All right, just one minute before I

21   hear from the government.

22             (PAUSE IN PROCEEDINGS.)

23         THE COURT:  I don't have any additional

24   questions or inquiry of the defense at this time.  I may

25   have some later on.

1    Ms. Sparks, would the government like to be heard?

2         MS. SPARKS:  Yes, Your Honor.  Your Honor, this

3    is one of those cases well, all my cases are like this

4    where I have to make a decision on where this case will

5    be presented to the Court.  In other words, if there is

6    going to be a plea, what plea am I going to offer.  In

7    this case, as the Court is well aware, this Defendant was

8    initially charged with enticement of a minor which fits

9    the facts.  There are facts to support that.  When I sat

10   down with the victim and victim's family a year or so ago

11   and told them and asked them what was their position on

12   things, and they really wanted this case over more than

13   anything else, and their primary desire was the victim

14   would not have to testify.

15       We talked about different possibilities.  One of the

16   things I asked them was I said well, would you like me to

17   make this offer receipt of child pornography, and they

18   actually were very happy with that offer.  So in my mind,

19   if it were just me making this decision as to what to

20   charge him with I would say let's go forward on this

21   enticement charge.  It fits the facts.  We have someone

22   who engaged in sexual intercourse with a minor several

23   times.  As the Court pointed out, it would have gone on

24   had law enforcement not intervened.  We have a situation

25   where we have pretty egregious conduct for at least a

1    month or so going on.

2         We have some chats going on back and forth between

3    someone who is in their late twenties with someone who is

4    15 years old.  I think in the victim's mind this was a

5    relationship.  I think that is the way she saw it, and

6    sometimes that happens in these cases.  So she did

7    present a letter that we indicated to the Court that she

8    did not want to pursue going forward even to talk at

9    sentencing.  That gives you a bit of an idea of where she

10   is with on all of this.

11        At the end of the day, Your Honor, I think this is

12   pretty egregious conduct.  We have actual contact.  We

13   have somebody who is charged at the state for sexual

14   assault of a child.  As the Court has pointed out several

15   times, we have a situation where perhaps the parties

16   aren't coming with equal position.  She is a child and,

17   she also had just broken up with her boyfriend.

18   Mr. Porter presented himself as 18, somebody who she

19   would probably want to talk to, and he didn't disclose

20   his age, but, you know, she maintained the relationship

21   with him at that time.

22        So at the end of the day, Your Honor, somewhere from

23   mid to high end of the guidelines is appropriate in this

24   case.  Had we gone forward with a regular charge or the

25   indicted charge, his minimum would have been ten years, I

1  think that is certainly fair and reasonable.  It is

2  within the guideline range, and I think that under the

3  facts and circumstances of the case that that would be

4  sufficient, not greater than necessary to meet the

5  factors of 3553.

6          THE COURT:  Thank you, Ms. Sparks.

7      Ms. Culpepper, let me see you at the bench.

8  Ms. Shifflett, let me also see you at the bench.

9          (PAUSE IN PROCEEDINGS.)

10         THE COURT: All right, you can have a seat

11  momentarily.

12         (PAUSE IN PROCEEDINGS.)

13         THE COURT: All right, you may return to the

14  lectern, Mr. King and Mr. Porter.  There is one thing I

15  want to address.  I don't know that the Court can accept

16  the argument that this matter did not start out with the

17  intent to have sex.  When you look at the totality of the

18  text messages and e-mails on what happened on the 7th of

19  June of 2014 and what happened on the next day, I am

20  having trouble embracing the argument that Mr. Porter did

21  not begin this communication with the intent of having

22  sex with this minor.  I want to hear that explained.

23         MR. KING: Your Honor --

24         THE COURT: To be honest with you, let me just

25  say this.  Everybody is grown.  Everybody is an adult in

1 this courtroom.  I guess the only time that you would out

2 of the door say something of an explicit sexual nature is

3 it were a brothel or house of prostitution or something

4 of that sort or a swingers' club.

5      Usually when you meet someone on line, the first

6 thing out of your mouth is not of a sexual nature.  You

7 sort of ease your way into it, build your way up to it.

8 To be honest, on the day they met, there are innuendos

9 and things of a sexual nature.  What I am saying is it

10 doesn't take a rocket scientist to look down through the

11 muddy waters and spot the fish.  There is little word

12 thrown out here, word thrown out there.  As you read

13 along, the words are more explicit.  Like on the second

14 day after -- day after they met, 4:30 in the morning,

15 Mr. Porter is talking about how he had to change his

16 sheets, change his shorts.  Now, come on.  Everybody

17 knows what he is talking about there.  This is 4:30 in

18 the morning.  They only started talking on the 7th.

19      I will admit, you are not going to see the words sex

20 on the first few exchanges.  You don't see that.  There

21 is conversation that leads up to that.  I cannot except

22 the premises that he was not heading towards a sexual

23 relationship with this person.  I am willing to listen to

24 anything you have to counter that.

25           MR. KING:  Thank you, Your Honor.  I will

1    address that in two points.  The first is that there is

2    no evidence that exists that he had ever done this before

3    and again, I stress the government was in possession of

4    all the text --

5          THE COURT: Let me assume that is correct.  Let

6    me assume that that is correct, but when I read what went

7    on and I am going to have this as a Court Exhibit because

8    I don't know what is going to happen here.  I think this

9    needs to be a Court Exhibit.  It is -- I believe it is

10   the case agent's summary and attachment of e-mails of

11   MeowChats and text messages and so forth.  I will order

12   it to be filed under seal, so it is not accessible to the

13   public, but I think it ought to be Court Exhibit No. 1.

14   I want to know if there is any objection from the

15   government.

16         MS. SPARKS:  No, Your Honor.

17         THE COURT: Any objection from the defense?

18         MR. KING: No, Judge.

19         THE COURT:  I will have Ms. Crawford mark this

20   as Court Exhibit No. 1.  It is to be placed under seal

21   and not to be disclosed to the public unless I or the

22   Fifth Circuit order otherwise.  Go ahead.

23         MR. KING: At the outset, clearly there was sex

24   and Mr. Porter admitted to that when he was caught.  To a

25   certain extent, I argued this already on my heels and I

1  realize that happened.  There is no way we can defend

2  against that.  I think leaving aside the argument that

3  there was no evidence that the -- the evidence suggests

4  this was the one and only time this happened.

5      The conversation begins even if there are sexual

6  overtones, that is a lot of times why people are online

7  or use these apps is to do mature things like that.

8      As the assessment indicated, Mr. Porter is already

9  not mature-wise, not at his age level, that he is

10  younger.  It was a dumb thing to do, but the first

11  overtly sexual thing of sexual nature was the e-mail from

12  JV1 to Mr. Porter describing a very detailed sexual

13  encounter.  That was the first real indication of

14  anything of an overtly sexual nature.

15      She was the one who initiated that.  Again, not as a

16  defense to Mr. Porter's actions, but in response he did

17  not have the intention to actually have sex with her.  I

18  don't think the evidence can say that by preponderance.

19  A lot of people get online to have these conversations to

20  do things.

21          THE COURT: You make reasonable inferences.  Just

22  one minute.

23          (PAUSE IN PROCEEDINGS.)

24          THE COURT: You mentioned that e-mail that the

25  minor JV1 sent.  When was that sent?

1          MR. KING: At the end of the conversation on the

2    first day the 7th, I believe.  It could have been very

3    early on the 8th, but it was towards the beginning.

4          THE COURT:  Okay, that is on June 8th, you said;

5    right?

6          MR. KING: Yes, Your Honor.  That is what

7    prompted the response messing up the sheets and things of

8    that nature.  It was that e-mail that he was referring

9    to.

10          THE COURT: I have seen that.  That was sent

11    early in the morning on the 8th as was the statement made

12    about the sheets, the shirt, and so forth.

13          MR. KING: It was, Judge.  It was JV1 that first

14    provided her phone number and things like that.  Again,

15    this argument is on my heels because sex happened.  I

16    don't think the evidence by a preponderance demonstrates

17    that his purpose in participating in this conversation

18    was sex.  I think that it could have easily gone the

19    other way.  People get involved in these types of

20    conversations, not that it is right, but for boredom or

21    whatever reason and they go down this road that they

22    shouldn't be going down and one things leads to another.

23    I just disagree that the evidence demonstrates -- I don't

24    think there is any evidence that demonstrates he started

25    this dialogue with that intention.

1    THE COURT: Let me ask you this question because

2  I want to clear up something else.  It goes to something

3  in the presentence report.  Let me find it.  It is in

4  paragraph 46.  It is talking about Mr. Porter.  In this

5  case, it is talking about the Defendant's father.  The

6  sentence in paragraph 46 of the presentence report that

7  starts with the following, quote, Mr. Porter stated he is

8  aware of the Defendant's charges, but he believes the

9  victim in this case told the Defendant she was 18, when,

10  in fact, she was not.  Mr. Porter indicated the Defendant

11  -- well, that is unnecessary.  The sentence reads as

12  follows:  Mr. Porter is aware of the Defendant's charges,

13  but he believes the victim in this case told the

14  Defendant she was 18 when, in fact, she was not, unquote.

15  What is the defense's position about the age of the

16  minor?

17    MR. KING: That she was 15 at the time of the

18  misconduct.

19    THE COURT: And that he knew that; is that

20  correct?

21    MR. KING: It is correct, Judge.  He would not

22  have pled.

23    THE COURT:  All right. ; okay.

24    MR. KING: Your Honor, if the Court wants to hear

25  anything further with regard to your first question, I

1  could ask Mr. Porter a couple of questions about that

2  unless the Court is ready to move on.

3          THE COURT: Well, if you want to ask questions --

4  if you ask questions, I am going to place him in oath, if

5  you want to ask him other questions.

6          MR. KING: I would.  I would like to ask him more

7  questions.

8          THE COURT: All right, Mr. Porter raise your

9  right hand.

10          (DEFENDANT SWORN.)

11          THE COURT: All right, you may proceed, Mr. King.

12          MR. KING: Thank you, Judge.

13  Q.  (BY MR. KING) Jordan, at the time that you started

14  this conversation through this app, did you have any

15  other friends?

16  A.  No, I did not.

17  Q.  How did you spend your time?

18  A.  Well, I mostly was just at home doing chores around

19  the house.

20  Q.  What was -- initially, what was your reason engaging

21  in this conversation through this app?

22  A.  Just trying to meet new people was my initial thing.

23  Q.  And once you started the dialogue with the girl JV1?

24  A.  Uh-uh.

25  Q.  You saw the screen shot that indicated her age;

1  right?

2  A.  Right.

3  Q.  And again, when you initiated or rather when

4  conversation began with her, what was your intention at

5  the outset?

6  A.  Just making conversation with somebody, just trying

7  to get to know people out there.

8  Q.  And obviously other things?

9  A.  And that too.

10  Q.  At the outset, your intention was not to meet young

11  girls for sex, would that be accurate?

12  A.  That would be accurate.

13        MR. KING: Nothing further, Your Honor.

14        THE COURT: All right, anything from the

15  government in this regard, Ms. Sparks?  Any

16  cross-examination, Ms. Sparks?

17        MS. SPARKS:  Sure, Your Honor.

18        THE COURT: All right.

19        MS. SPARKS:  Would you like me to cross from

20  here?  Is that appropriate?

21        THE COURT: That's fine.

22              **C R O S S    E X A M I N A T I O N**

23  Q.  (BY MS. SPARKS) Mr. Porter, I have just a few

24  questions regardless of what you are saying your initial

25  intent was.  It is true within a few conversations that

1   your discussion with the victim in this case went sexual;

2   is that correct?

3   A.   Correct.

4   Q.   And, in fact, you sent pictures of your own

5   genitals?

6   A.   Correct, after I was sent photos from her.

7   Q.   So you are saying you would not have sent any

8   pictures of yourself except this minor child sent you

9   pictures; correct?

10  A.   Correct.

11  Q.   So the conversation where you say it is making me

12  really horny and sent pictures of yourself, you said if

13  you will send me some of you, what is your response to

14  that?

15  A.   I --

16  Q.   You don't recall that conversation?

17  A.   No, I do not.

18  Q.   Specifically, let me see here.  Let's get the right

19  date.

20          MS. SPARKS:  Your Honor, for the Court's

21  clarification, it is June 8, 2014.  I think it is the one

22  the judge mentioned earlier, and you are talking about

23  you said cuddle naked and two laughing emoticons.  She

24  says, Hmm, close to naked.  You say okay.  And then you

25  say, As long as we are together, and the victim says, If

1  you want, we can snuggle a bunch.  You say, So the pic

2  did nothing for you frowning emoticon.  She said, It made

3  me so horny.  And you said, Yours would, if I had any,

4  and then we get these pictures, and that is what the

5  judge was eluding to.  You don't recall that

6  conversation?

7  A.  No, I do not.

8  Q.  That was June 8, 2014, the Court according to the

9  chat longs that started on June 7, 2014, so that was the

10 next day?

11 A.  Yes.

12 Q.  And you also admitted that you sent pictures of

13 vibrators?

14 A.  Yes.

15 Q.  And as you have already mentioned that you guys

16 actually did, in fact, engage in sexual intercourse?

17 A.  Yes.

18 Q.  How many occasions?

19 A.  I do not recall.

20 Q.  And you also sent her a story regarding about how she

21 was going to lose her virginity and what that entailed;

22 do you recall that?

23 A.  No.

24 Q.  Very explicit conversation where you talked to her

25 about -- let me find the date here -- I believe it is

1  June 11, 2014, and I believe where it says things you

2  have to know, starts with that.  It says you are going to

3  want to know all about -- all of this, my princess, how

4  to lose your virginity without pain and goes on to

5  describe in explicit detail.

6          MS. SPARKS:  In fact, I don't have exhibit

7  stickers, but may I show this to the Defendant and mark

8  it with my pen as Government's Exhibit No. 1?

9          THE COURT: I think it is included in the Court's

10 exhibit.  I believe it is, but I will let you do it out

11 of abundance of caution, that is going to be placed under

12 seal.  Any objection to that, Mr. King?

13         MR. KING: No, Your Honor.

14         MS. SPARKS:  May I approach the witness?

15         THE COURT:  You may.

16 Q.  (BY MS. SPARKS) Do you recognize that e-mail that you

17 sent to the victim?

18 A.  No.

19 Q.  Are you saying you never sent it or you just don't

20 remember?

21 A.  I don't even think I sent it to tell you the truth.

22         MR. KING: Your Honor, I am just going to object.

23 I think a lot of these questions are outside the scope of

24 direct.  Direct asked specifically about his intent in

25 initiating conversation.  The defense has admitted and

1   Mr. Porter has admitted that it obviously turned into a

2   conversation of a sexual nature.  This is clearly an

3   attempt just to cause Mr. Porter to remember things.

4   Quite honestly, he has not reviewed in a very long time

5   and again, that is on me.  He has been up front that this

6   turned to a sexual nature.  We are not denying that;

7   merely that's how it started, the initial -- his thoughts

8   when the conversation was first initiated.

9       That is all he testified to.  He has admitted that it

10  turned sexual.  I don't understand the relevance of these

11  additional questions.

12         THE COURT: What is the government's response,

13  Ms. Sparks?

14         MS. SPARKS:  My response, Your Honor, this all

15  happened in a very short period of time, and so I think

16  it goes to what his intent actually was, and it is not

17  like this started on June 1st, and then on July 15th they

18  decide they are going to start talking about sex.  This

19  is all literally within a matter of hours.  I think it

20  goes to the specific question the Court was asking and

21  for the specific reason that the Defendant was put under

22  oath, but he stated that he doesn't recall this e-mail

23  anyway, so the Court can take that for what it is worth,

24  and that is all the questions I have anyway.

25         THE COURT:  I am going to overrule the

1  objection.  I think it goes more to the weight.  I agree

2  with the government.  This did happen rapidly.  It was

3  like they had a conversation, and two weeks later another

4  one, and six weeks later it got to this point.   This

5  happened rapidly.

6         MR. KING: May I reply very briefly, Your Honor?

7         THE COURT: You may redirect and whatever

8  questions you ask you in redirect, the government may be

9  inclined to go in and expand on that which it would have

10  a right to do, so keep that in mind.

11         MR. KING: I will, Judge.

12         THE COURT: All right.

13         R E D I R E C T   E X A M I N A T I O N

14  Q.  (BY MR. KING) Jordan, you understand the questions

15  asked you by the prosecutor, this is based upon evidence

16  that has been gathered and presented we went over a long

17  time ago; right?

18  A.  Yes.

19  Q.  You are not denying that the evidence contained in

20  there are things that you did and said of a sexual

21  nature, are you?

22  A.  No.

23  Q.  You admit you did that?

24  A.  Yes.

25  Q.  Again, my question was at the outset, at the very

1  beginning, did you have the intention of having sex with

2  this girl?

3  A.   No, I did not.

4  Q.   By the outset, the first few lines of conversation?

5  A.   Right; no.

6  Q.   You did not?

7  A.   No, I did not.

8            MR. KING: Okay, thank you, Your Honor.

9            MS. SPARKS:  Nothing further, Your Honor.

10           THE COURT: All right, any final argument, so we

11  can bring this matter to a close?

12           MR. KING: No, Your Honor, I think the defense

13  has made all of its points.

14           MS. SPARKS:  I don't have anything further, Your

15  Honor.

16           THE COURT: All right, thank you.  The Court has

17  reviewed the presentence report.  The Court has also

18  reviewed the investigative packet and summary compared by

19  the agent which has attached to it certain e-mails and

20  text messages that took place between a minor and

21  Mr. Porter.  All of that has been admitted into evidence

22  as Court Exhibit No. 1.

23      The Court has also heard from Defense Counsel

24  Mr. King.  The Court has heard from Mr. Porter.  The

25  Court has heard from Mr. Porter, and Mr. Porter's father,

brother, Mr. Matt Porter, and Ms. Cornelius.  The Court

heard last time from Ms. Boisen, I believe who was from

out of town, and the Court allowed her to speak because

it was postponing this hearing.

     The Court has also heard from government's Counsel,

Ms. Sparks, and the Court has heard some testimony, and

what the Court has to do is determine a sentence that is

fair, just, and reasonable under the circumstances.

     The defense has asked for a sentence of 60 months.

The guideline range is 63 to 78 months.  The guidelines

are not entitled to any presumption of reasonableness.

The guidelines have been referred to as a starting point

or a point of reference.  They have to be considered

before the Court comes up with a final sentence.

     The Court has to also consider the statutory factors

it referenced earlier.  The Court has to consider in

particular those factors under Paragraph (a)(2).  Of

course, the Court can also consider the factors under

paragraph (a)(1) of Section 3553, and that deals with the

nature and circumstances of the offense and the history

and characteristics of the Defendant.

     We have a situation here whereby an individual in

his late twenties begins having a conversation with a

minor who was 15 years old at the time and within a few

days of the initial conversation, there is sexual contact

1   and also there is sexual intercourse in addition to the

2   sexual contact on at least three occasions.  That is, we

3   know for a fact that sexual intercourse between

4   Mr. Porter and the minor took place on at least three

5   occasions, and there was another instance where there was

6   sexual contact.

7       The Court earlier stated that sexual contact is a

8   broad term because it can include anything from fondling

9   or kissing all the way up to sexual intercourse.  Of

10  course, the guidelines had a five-level enhancement if

11  sexual contact were involved.

12      As stated before, I have some concern about how that

13  is applied or the policy statement there because it

14  equates fondling -- well, it does not ascribe any more

15  points for fondling as it does for actual sexual

16  intercourse, and I don't think anybody can argue there is

17  a major difference between fondling and sexual

18  intercourse.  But under the guidelines, they are all

19  lumped into the broad category of prohibited sexual

20  contact.

21      As I was saying, we have a 12 or 13-year age

22  difference between Mr. Porter and the victim.  As stated

23  before, the evidence shows that we have a young lady who

24  had just broken up with her boyfriend, and as the Court

25  stated earlier, it is not uncommon for someone in that

1  position to be vulnerable.  As stated before, sex was not

2  the first thing out of Mr. Porter's mouth, but clearly

3  from the conversation, conversations that the Court heard

4  and based upon the evidence here, the conversations

5  rapidly progressed to those of a sexual nature.

6       Here is something I noticed.  It is somewhat subtle,

7  but it is present.  I don't hear an absolute

8  acknowledgment.  What is said somewhat subtly is that the

9  minor initiated it.  Maybe it is not so subtle, initiated

10 the sexual contact.  That has been not if not out right

11 advocated, implied on certain occasions.  I say that

12 because you have a 12 or 13-year age difference.

13      I understand that Mr. Porter is not at the same level

14 developmentally as other individuals his age, but I do

15 think that notwithstanding is a factor in this case

16 because you are talking about somebody who is 15 and

17 somebody else who is 27 or 28, maybe 28, 29.  I cannot

18 ignore that.  I cannot ignore that fact.

19      Also, I stated that it is not uncommon for young

20 girls to be impressed by the fact that an older man

21 expressed an interest in her or I should say use the word

22 plural.  Let me say it like this.  It is not uncommon for

23 a young girl to be impressed that an older male has

24 expressed an interest in her.

25      I think it is also important is that the reason this

1  stopped was because there was intervention by law

2  enforcement and before that, of course, the victim's

3  stepfather alerted law enforcement, and this would have

4  continued for sometime.  We do not know how long.  I keep

5  coming back to what has been said before, and that is,

6  the person was a minor, and this is not a situation

7  whereby there are two or three years difference.

8       For example, some states have a defense that if the

9  male is no more than two years older than the victim.

10  That is not the case here.  I already said there is some

11  12 years perhaps 13 years difference in age.  We don't

12  have that situation here.

13       So what the Court has to do is consider those

14  factors under Paragraph (a)(2) of Section 3553, that is,

15  what is a just punishment, what is the seriousness of the

16  offense?  There is no question we have a serious offense

17  before us.  What is an adequate deterrent?

18      As I stated before, there are reasons why we protect

19  minors.  There is a reason why we protect minors because

20  they have not developed to the point that adults have

21  developed.  They are impressionable.  They are

22  vulnerable, so the law protects them.

23       The guideline sentence range is 63 to 78 months.

24  The Court does not believe that that range provides a

25  reasonable just, and fair sentence under the

circumstances of this case.  Essentially, we have someone
who is preying on a minor.  The sentence has to be
imposed that would not only deter Mr. Porter from
engaging in this type of conduct.  I realize the
psychologist said the risk is low to moderate, but also,
it must put others on notice who might be inclined to
engage in this type of conduct.  Accordingly, the Court
takes it seriously.

Individuals have been sentenced to far more than
what's in the advisory guideline range under the same
statute and have received sentences of 20 or 30 years,
and the Fifth Circuit has upheld in those cases, and
there has been no sexual intercourse or sexual contact
with the victim.

It is true in this case we only have a few images,
but we do have sexual intercourse.  In fact, when the
Court read the materials submitted by the defense, there
was a case or two cited by the defense when they were
talking about sentencing options.  The Court reviewed
those cases.  One of them is the Dumonde case.  In that
case there was no sexual contact if my memory is correct.
When the Court considers the need for just punishment,
the seriousness of the offense, deterrence, respect for
the law, protection of the public, the Court believes
that a reasonable sentence in this case is a sentence of

1  84 months.

2      Accordingly, the Court hereby sentence Mrs. Jordan

3  Michael Porter to a term of 87 months in the Bureau of

4  Prisons.

5          MR. KING: You stated 84 and 87.

6          THE COURT:  84 -- I stand corrected.  84 months.

7  Mentally I was thinking of seven years when I said 87,

8  but it is 84 months, seven years.  The sentence that the

9  Court just imposed, the sentence of 84 months should run

10 concurrently with any sentence imposed in the case

11 pending in the 282nd District Court of Dallas County.

12 That charge is the sexual assault of a child, case number

13 F-14203.

14      The Court orders the sentences to run concurrently

15 with any sentence that might be imposed in that case

16 because the case in this Court is related -- the case in

17 this Court in the state case are related.  The Court

18 imposes no fine because the Court determines that he does

19 not have the resources or future earning capacity.  As

20 required by law, the Court hereby imposes a special

21 assessment of $100.

22      With respect to supervised release, I believe the

23 term runs from five years to life.  The Court hereby

24 imposes a term of ten years supervised release.  It is

25 further ordered that upon release from imprisonment,

1   Mr. Porter shall comply with the standard conditions

2   contained in this judgment and comply with the mandatory

3   and special conditions hereafter stated.  He shall not

4   commit another federal, state, or local crime.  He shall

5   not illegally possess controlled substances.  He shall

6   cooperate in the collection of DNA as directed by the

7   probation officer.  He shall not possess a firearm,

8   ammunition, destructive device, or any dangerous weapon.

9   He shall report in person to the U.S. Probation Office in

10  the district to which he is released from the custody of

11  the Federal Bureau of Prisons within 72 hours of such

12  release.

13      He shall refrain from any unlawful use of a

14  controlled substance.  He must submit to one drug test

15  within 15 days of release from imprisonment and at least

16  two periodic drug tests thereafter as directed by the

17  probation officer.  Mr. Porter shall participate in a sex

18  offender treatment services as directed by the probation

19  officer until successfully discharged.  These services

20  may include psychological testing to monitor his

21  compliance, treatment progress and risk to the community.

22  He must contribute to the cost of these services

23  rendered, that is, a copayment at the rate of at least

24  $10 dollars per month.

25      Mr. Porter shall register with state and local law

1  enforcement as directed by the probation officer in each

2  jurisdiction where he resides, is employed, or is a

3  student.  He shall provide all information required in

4  accordance with state registration guidelines.  Initial

5  registration shall be completed within three business

6  days after release from confinement.

7       He shall provide written verification of

8  registration to the probation officer within three

9  business days following registration.  This registration

10  shall be renewed as required by Mr. Porter's assigned

11  tier.  He shall no later than three business days after

12  change of name, residence, employment, or student status

13  appear in person in at least one jurisdiction and inform

14  that jurisdiction of all changes and information required

15  in the Sex Offender Registry.

16       Mr. Porter, shall have no contact with persons under

17  the age of 18, including by correspondence, telephone,

18  internet, electronic communication, or through third

19  parties.  He shall not have access or loiter near

20  schools, parks, arcades, playgrounds, amusement parks,,

21  or other places where children may frequently congregate.

22  He shall neither seek nor main employment or volunteer

23  work at any location or activity where persons under the

24  age of 18 congregate without prior permission from the

25  probation officer.

1    Mr. Porter shall not date or be friend anyone who

2  has children under the age of 18 without prior permission

3  of the probation officer.

4    He shall neither possess or have under his control

5  any sexually oriented or sexually stimulating materials

6  of adults or children.  This includes visual, auditory,

7  telephonic, electric media, e-mail, chat communications,

8  instant messaging, or computer programs.  The Defendant

9  shall not patronize any place where such material or

10  entertainment is available.  He shall not use any

11  sex-related telephone numbers.

12    Mr. Porter shall have no contact with any victim of

13  this offense or any contact with the victim of this

14  offense, including by correspondence, telephone, or

15  communication through third parties, except under

16  circumstances approved in advance by the probation

17  officer.  He shall not enter into the premises, travel

18  past, or loiter near the victim's residence, place of

19  employment, or any place that is frequented by the

20  victim.

21    Mr. Porter shall participate and comply with the

22  compliance computer and internet monitoring program

23  contributing to in an amount not to exceed forty dollars

24  a month consent to the probation officers monitor of

25  computer or computers.  The monitoring may include

1  installation of hardware and/or software systems that

2  allow evaluation of computer use.

3      Mr. Porter shall not remove, tamper with, reverse

4  engineer, or circumvent the software in any way.  He

5  shall only use authorized computer systems that are

6  compatible with the software and/or hardware used by the

7  Internet Monitoring Program.

8      He shall permit the probation officer to conduct a

9  preliminary computer search prior to the installation of

10  software.  At the discretion of the probation officer,

11  the monitoring software may be disabled or removed at any

12  time during the term of supervision.

13      Mr. Porter shall submit to periodic unannounced

14  examinations of his computer or computers, storage media,

15  and/or electronic internet-capable storage devices,

16  performed by the probation officer at reasonable times

17  and in a reasonable manner based upon reasonable

18  suspicion of contraband evidence of a violation of

19  supervision.  This may include retrieval and copying

20  and/or removal of such system for the purpose of

21  conducting a more thorough inspection.  Mr. Porter shall

22  provide written authorization for release of information

23  from his internet service provider.

24      Mr. Porter shall provide the probation officer with

25  accurate information about his entire computer system.

1  His email shall only be accessed through a preapproved

2  application.  Mr. Porter shall not install new hardware,

3  perform upgrades, or effect repairs on his computer

4  system without receiving prior permission from the

5  probation officer.

6       He shall not maintain or create a user account on

7  any social network site, that is, Myspace.com,

8  Facebook.com, Adultfriendfinder.com, et cetera, that

9  allows persons under the age of 18 or allows for the

10 exchange of sexually explicit material, chat

11 conversations, or instant messaging.

12    Mr. Porter shall neither view nor access any web

13 profile of users under the age of 18.  He shall not use

14 or possess any gaming consoles including, but not limited

15 to Xbox, Playstation, Nintendo, or devices without prior

16 permission from the probation officer.

17    Mr. Porter shall not use or possess a web cam or any

18 other hardware that allows for the exchange of video or

19 photographs online.

20    Mr. Porter shall not access any service or use any

21 software that allows for direct peer-to-peer contact

22 which may include chat rooms, file sharing, or other

23 similar activity without prior permission of the

24 probation officer.

25    Mr. Porter shall not use or own any device that

1 allows internet access other than authorized by the

2 probation officer.  This includes, but not limited to,

3 PDAs, electronic games, and cellular/digital telephones.

4    Mr. Porter shall not access any internet service

5 provider or other online service using someone else's

6 account, name, designation, or alias.

7    Okay, Ms. Sparks, I didn't see a preliminary order

8 of forfeiture.  Is there an issue of forfeiture in this

9 case?

10      MS. SPARKS:  There is.  They actually published

11 the forfeiture and there is a preliminary order of

12 forfeiture.  It is document number 44 filed on April 8,

13 2015, and there was notice given that the government

14 actually published this forfeiture action as well and

15 that is document number 51.  I have copies if the Court

16 needs them.

17      THE COURT: Okay, she is getting copies.  While I

18 am waiting for that, Mr. Porter, let me tell you this.

19 There was a preliminary order of forfeiture.  I will get

20 the exact terms, but that preliminary order of forfeiture

21 is now made final as to you.  It is also part of your

22 sentence.  When I say there is an order of forfeiture, do

23 you know what that means?

24      THE DEFENDANT:  Yes, sir.

25      THE COURT:  What is your understanding, sir?

 1          THE DEFENDANT:  It says you forfeited my

 2  computer, cell phone, and tablet.

 3          THE COURT: I understand, but what does forfeit

 4  mean?

 5          THE DEFENDANT:  Give it up.

 6          THE COURT: You understand?

 7          THE DEFENDANT:  Yes, to give up.

 8          THE COURT: You give up any title, interest,

 9  claim or right to the property.  In other words, you no

10  longer have any interest, claim, or title to the property

11  that we are talking about; do you understand that, sir?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT: Insofar as you are concerned that

14  preliminary order of forfeiture that was entered by the

15  Court is now final as to you and that is part of your

16  sentence; do you understand that, sir?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  All right, Mr. King, is there a

19  request for a particular facility?

20          MR. KING: Yes, Your Honor, FCI Seagoville.

21          THE COURT: All right, Mr. Porter your attorney

22  has made request that you be allowed to serve your

23  sentence at Seagoville.  I will include that in my

24  judgment, but however, keep in mind it is the Bureau of

25  Prisons not the Court that ultimately decides where you

1    serve your sentence.  It is my understanding to the

2    extent that the Bureau of Prisons can accommodate the

3    Court's recommendation, they will do so.

4         All right, Mr. Porter, we earlier mentioned the

5    preliminary order of forfeiture.  That was entered by the

6    Court on April 8, 2015, and in that preliminary order of

7    forfeiture, talks about certain property being forfeited,

8    that is, IPhone 4,s/n dx4kfwaydpon, IMEI:

9    013266001643842; and a Samsung CE 0168 tablet, model:

10   GT-P51132W, s/n RF2D714186N, which is referred to as the

11   property.

12        As stated before, that means you are giving up any

13   right, claim, or title to the property and that the

14   preliminary order of forfeiture that was entered by the

15   Court on April 8, 2015, is now made final as to you; do

16   you understand that, sir?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right, Mr. Porter, based upon

19   what the Court has done here today and in light of your

20   plea agreement, in particular paragraph 11, page 5, the

21   Court does not believe there is any basis for you to

22   appeal its decision.  However, if you disagree, any

23   appeal that you take must be taken within 14 days of my

24   written decision which will issue tomorrow.  If you

25   cannot afford the costs of an appeal, you have the right

1  to ask for permission to proceed in forma pauperis.

2  Also, if you cannot afford an attorney for purposes of

3  appeal, you have the right to request an attorney and one

4  will be provided to you.

5     Is there anything further on this case at this time?

6        MS. SPARKS:  Your Honor, based upon the

7  Defendant's plea of guilty to the superseding

8  information, we would ask that the indictment filed in

9  this case be dismissed as to -- which are two counts of

10  enticement of a minor as well as attempted enticement of

11  a minor, that those be dismissed again based upon the

12  plea of guilty to the superseding information.

13        THE COURT: Thank you, Ms. Sparks.  The

14  government's motion is granted and the indictment

15  originally filed in this case on July 9, 2014, is hereby

16  dismissed as to both counts.  Is there anything further

17  on this case?

18        MS. SPARKS:  Your Honor, I would just ask that

19  the sentence that has been imposed today based upon the

20  Court's taking into consideration all the 3553 factors

21  regardless of what the guideline sentence would have been

22  in this case?

23        THE COURT:  Absolutely.  I thought I made that

24  clear because I didn't think the guidelines sentence

25  adequately took those matters into account.

1          MS. SPARKS:  Just wanted it clear for the

2    record, Your Honor.  Thank you.

3          MR. KING: Nothing from the defense, Judge.

4          THE COURT: All right, there being nothing

5    further, the Court since recess.

6      Mr. Porter, you are remanded to the custody of the

7    United States Marshal.

8          THE COURT SECURITY OFFICER: All rise.

9    *I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.*
10   *I further certify that the transcript fees format comply
     with those prescribed by the court and the Judicial*
11   *Conference of the United States.*

12        *S/Charyse C. Crawford*          *08-05-2016*
     Signature_____ Date:_____
13             Charyse C. Crawford, CSR, RPR
               United States Court Reporter
14             Northern District of Texas - Dallas Division

15

16

17

18

19

20

21

22

23

24

25